Mary E. BROWN, on behalf of herself
and all others similarly
situated, Plaintiffs,

and

Liberia Johnson, Intervening Plaintiff,

v.

Frances E. PORCHER, in her official capacity as Claims Adjudicator of the South Carolina Employment Security Commission, and H. C. Sloan, in his official capacity as Appeals Referee of the South Carolina Employment Security Commission, and C. Len Harper, in his official capacity as Chairman of the South Carolina Employment Security Commission, and Cecil Sandifer, in his official capacity as Vice–Chairman of the South Carolina Employment Security Commission, and Frank E. Baldwin, Jr., in his official capacity as Commissioner of the South Carolina Employment Security Commission, Defendants.

Civ. A. No. 79–0561–1.

United States District Court,
D. South Carolina,
Charleston Division.

Oct. 22, 1980.

Thomas J. Rubillo, Neighborhood Legal Assistance Program, Inc., Georgetown, S. C., for plaintiffs.

Jill A. Hanken, Neighborhood Legal Assistance Program, Inc., Charleston, S. C., for intervening plaintiff.

Daniel R. McLeod, Atty. Gen., C. Talbot Goolsby, Deputy Atty. Gen. by: David C. Eckstrom, Staff Atty., and Robert G. Horine, Gen. Counsel, William H. Griffin, Asst. Gen. Counsel, Columbia, S. C., for defendants.

## ORDER

HAWKINS, District Judge.

### INTRODUCTION

This is a case of first impression. It is a class action challenge to the policies and practices of the South Carolina Employment Security Commission which deny employment compensation to women due to pregnancy. The Employment Security Commission regularly imposes the penalty of disqualification from employment compensation upon women who are otherwise eligible for aid if they left their most recent work due to pregnancy. The disqualifica-

tion is imposed based upon a routine finding that women who left work because of pregnancy voluntarily quit their most recent work without good cause. Plaintiffs contend these policies abridge federal statutory and constitutional rights. Accordingly, they seek declaratory and injunctive relief to halt implementation of the policies of which they complain. Equitable restitution is sought on behalf of those who have been injured by these policies in the past. It bears emphasizing that plaintiffs do not seek payment of unemployment compensation to women who cannot work because of pregnancy. Plaintiffs seek only to have compensation paid to women who are able to work and available for work.[1]

## THE UNEMPLOYMENT COMPENSATION SYSTEM

The unemployment compensation program is a joint federal–state effort. Its purpose is to provide partial wage replacement for workers during periods of unemployment. The system was created during the Great Depression to ease the economic burden of unemployment "which so often falls with crushing force upon the unemployed worker and his family..." S.C. Code Ann. § 41–27–20 (1976). This cooperative system is governed by both federal and state law. Under it, benefits are paid to eligible unemployed workers from a special trust fund. This fund is administered "separate and apart from all public monies or funds of the state." S.C.Code Ann. § 41–33–10 (1976). The fund is composed of monies paid by employers who are subject to the State's unemployment compensation laws. The system is similar in many respects to a simple insurance system. The

amount of an employer's contribution is based upon the number of insured workers in his or her employ and the number of claims made against the employer's accounts. S.C.Code Ann. § 41–31–30 (1976). It, like other fringe benefit programs for employees, provides workers with partial protection against economic loss when they are out of work. Employer contributions to the unemployment trust fund can, therefore, be fairly characterized as payments made in lieu of wages. It is not a "welfare" system, but an entitlement system.

Funds for the administration of the State's unemployment compensation program do not come from the compensation trust fund. Federal tax dollars pay these latter costs. The federal funding mechanism is set out in both the Social Security Act and the Federal Unemployment Tax Act. 42 U.S.C. § 501, *et seq.*, and 26 U.S.C. § 3301, *et seq.* These federal laws allow the states to operate their unemployment compensation systems free from undue federal interference. However, as part of this system of operating grants, the federal government has placed a very limited number of explicit conditions on receipt of federal operating funds by the states. *See New York Tel. Co. v. New York Labor Department,* 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979). These standards apply to all states and "in the judgment of Congress are to be ranked as fundamental." *Steward Machine Co. v. Davis,* 301 U.S. 548, 594, 57 S.Ct. 883, 894, 81 L.Ed. 1279 (1937).[2]

In the instant case, plaintiffs seek to have the court enforce one of these fundamental standards. It is plaintiffs' position that the policies and practices of the South Carolina Employment Security Commission which

---

1. Plaintiffs' action focuses principally on those situations in which women have returned to the job market and are actively seeking work after having a child. In a few instances, the issues addressed in this action touch upon women who are seeking work while they are still pregnant.

2. The leading case on the issue of fundamental standards is *California Department of Human Resources v. Java,* 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971). In that case the U. S.

Supreme Court ordered the State of California to amend its procedures to comply with the federal requirement that its administrative system for payment of unemployment compensation "be reasonably calculated to insure full payment of benefits when due." 42 U.S.C. § 502(a)(1). In that action, the court allowed an individual claimant injured by California's practices to seek judicial redress under the federal funding statutes.

deny unemployment compensation to otherwise eligible women because of pregnancy, violate the fundamental federal standard set out in 26 U.S.C. § 3304(a)(12). That provision states in relevant part that "no person shall be denied compensation ... solely on the basis of pregnancy or termination of pregnancy."

## South Carolina Law

South Carolina's unemployment compensation law creates a three–stage process for determining whether a claimant will receive payment. The first stage is a decision regarding whether the worker is "insured" pursuant to S.C.Code Ann. § 41–27–210. If the person is not "insured", benefits are denied. If the worker is "insured", a decision is next made as to whether he or she is "eligible" for benefits. Eligibility determinations turn on the claimant's ability to work, her availability for work, and whether the claimant is actually seeking work. S.C.Code Ann. § 41–35–110. An "insured" and "eligible" worker may nonetheless be denied compensation at stage three of the process. The penalty of "disqualification" can be imposed upon an otherwise eligible claimant pursuant to S.C.Code Ann. § 41–35–120. By far the two most common reasons for disqualification are those imposed because (1) an otherwise eligible worker "has left voluntarily without good cause his most recent work", or (2) because the worker was "discharged for misconduct connected with his most recent work ..." S.C. Code Ann. § 41–35–120(1) and (2). Payment of benefits to those discharged for misconduct generally is delayed for a number of weeks. Those found to have "voluntarily quit" their last job are "indefinitely disqualified" from receipt of benefits.[3] The South Carolina Employment Security Commission uses these two provisions–principally the "voluntary quit" provision–to deny unemployment compensation to otherwise

"insured" and "eligible" women who left their most recent work because of pregnancy. It has done so since at least the year 1972.

## FINDINGS OF FACT

### Parties

Plaintiff Mary E. Brown and Plaintiff Liberia Johnson are two women who were denied unemployment compensation because they left their most recent work due to pregnancy. They sue on behalf of themselves and a class of other women who are similarly situated. Both plaintiffs were indefinitely disqualified from receipt of unemployment compensation based on a finding by the South Carolina Employment Security Commission that they left their most recent work "voluntarily" and "without good cause" because they were pregnant.

### Plaintiff Brown

Plaintiff Mary E. Brown is a member of the Church of Christ. It is a tenet of belief within the Church of Christ that it is wrong to artificially terminate a pregnancy prior to term. Plaintiff Brown had worked full–time as a dietary aide at Georgetown County Memorial Hospital. She learned she was pregnant in December 1977. She began to experience physical discomfort and sickness sometime thereafter. Her physician advised her not to work if work became too difficult for her. On April 11, 1978, Plaintiff Brown informed her supervisor that she would be unable to work the following day. Hospital employees testified at Mrs. Brown's unemployment compensation hearing that Mrs. Brown's position at the hospital was not of the type which entitled her to a maternity leave. See Transcript of Hearing, Claimant Mary E. Brown, 7.[4] It is undisputed that her last day of work was April 12, 1978.

---

3. When disqualified "indefinitely", an insured worker can only requalify for unemployment compensation by returning to work and earning an amount equal to eight times his or her weekly benefit amount. . S.C.Code Ann. § 41–35 120(1).

4. While there is some dispute on the record about whether or not Mrs. Brown was granted a maternity leave from the hospital, that dispute is not relevant to the issues tried in this case.

Mrs. Brown gave birth to a son on September 14, 1978. On or about November 20, 1978, she sought to return to work but was informed by the supervisor of Food Services at the hospital that there were no openings in that department. On November 20, 1978, she applied for unemployment compensation benefits from the South Carolina Employment Security Commission. This application for aid was initially denied on December 15, 1978, by Defendant Frances E. Porcher. Defendant Porcher gave as the sole reason for the denial that:

> Claimant quit her job with [Georgetown County Memorial Hospital] on 4–12–78 due to pregnancy. This is a personal reason for quitting which is without good cause under the SCESC law and a disqualification is imposed.

The disqualification imposed was for an "indefinite" period.

Mrs. Brown appealed this initial determination. A hearing was held before Defendant H. C. Sloan on January 5, 1979. Defendant Sloan rendered his decision on January 10, 1979. The decision affirmed the indefinite disqualification which had previously been imposed.[5]

Filing a timely appeal, Mrs. Brown sought reversal of her disqualification by the South Carolina Employment Security Commission. On February 23, 1979, Defendants Comer[6], Baldwin and Harper, acting in their official capacities as chairman, vice–chairman and commissioner for the Commission, affirmed the determination denying Mrs. Brown unemployment compensation.

*Plaintiff Johnson*

Mrs. Liberia Johnson worked for Sam Solomon Co., Inc. in Charleston, S. C., for a period in excess of two years. She was a sales clerk. After becoming pregnant, she began experiencing various physical problems and sickness. She had to stop working as a result. She also believed she had been granted a maternity leave.[7] Whether she had been or not, however, is not relevant to the issues in this case. Her last day of employment at Sam Solomon Co., Inc. was sometime in August, 1978.

Mrs. Johnson's child was born on February 25, 1979. When she returned to her old employer seeking work, she was advised that there was no work available for her.[8]

On April 20, 1979, Mrs. Johnson filed a claim for unemployment compensation benefits. On May 8, 1979, a claims adjudicator for the South Carolina Employment Security Commission disqualified Mrs. Johnson from receipt of benefits based upon a finding that Mrs. Johnson had quit her most recent work without good cause.

Mrs. Johnson appealed this initial determination to an appeals referee of the Commission. A hearing was held on May 30, 1979, and a decision on that appeal was rendered on June 15, 1979. The appeals referee found that Mrs. Johnson's separation from work

> . . . occurred as a result of complications resulting from pregnancy. This is a personal reason not imposed upon her by the employer. Her quitting is therefore considered to have been for a personal reason, and personal reasons do not consti-

---

**5.** In addition to disqualifying Mrs. Brown because she left her most recent work due to pregnancy, Defendant Sloan also found Mrs. Brown ineligible to receive aid. That subsequent finding of ineligibility is not at issue in this action. Eligibility determinations are made on a weekly basis. They depend upon whether a woman has looked for a job that week. The undisputed record in this case shows that during the month of January, 1979, Mrs. Brown made a number of in person job hunting contacts and was subsequently employed as a maid. (Deposition of Mary E. Brown, p. 25, line 10, through p. 29, line 25.)

**6.** By oral order of this court on July 14, 1980, Comer was stricken as a defendant and was replaced by Defendant Harper in his official capacity as Chairman of the Commission, Defendant Baldwin was replaced by the naming of a new defendant, Sandifer, in his official capacity as Vice–Chairman of the Commission, and Defendant Harper was replaced by Defendant Baldwin in his official capacity as a Commissioner.

**7.** Transcript of Hearing, Liberia Johnson, 1, 2.

**8.** Id. 2

tute good cause for quitting available employment within the purview of the law.

A timely appeal of the decision of the appeals referee was filed with the South Carolina Employment Security Commission. Subsequently, Defendants Comer, Harper and Baldwin, acting in their official capacities as members of that Commission, affirmed the decision indefinitely disqualifying Mrs. Johnson from receipt of unemployment compensation on the grounds that she had voluntarily quit her most recent work without good cause. Mrs. Johnson has never been found otherwise ineligible to receive unemployment compensation benefits by the South Carolina Employment Security Commission.

Leave to intervene as a plaintiff in this litigation was granted to Mrs. Johnson by order of this court dated February 13, 1980. That order indicated that Mrs. Johnson was fully qualified to serve as representative of the class sought to be certified.

The record shows that Plaintiff Mary E. Brown applied for unemployment compensation on November 20, 1978. She was unemployed until on or about January 24, 1979. The record also shows that Plaintiff Liberia Johnson applied for unemployment compensation on April 20, 1979. The date of her reemployment, if any, is not shown on the record.

### Defendants

The named defendants in this action were or are all employees, agents or members of the South Carolina Employment Security Commission. At all relevant times, each was acting in his or her official capacity with the South Carolina Employment Security Commission. All defendants are residents of the State of South Carolina and are subject to the jurisdiction of this court.

### Policies

The policies at issue in this action are described in an official document published by the South Carolina Employment Security Commission. That document is entitled *Payment of Benefits to Pregnant and Post–Pregnant Claimants*. It reads in relevant part:

2. Any individual who voluntarily leaves her most recent work because of pregnancy is subject to the same disqualification provision of ... the South Carolina Employment Security Law as any other individual who voluntarily leaves for a personal reason not attributable to the employment.

3. An individual who is separated by the employer because of pregnancy will not be subject to a disqualification period under ... the Law.

4. A claimant who is separated from an employer because of a policy which provides for separation of a woman worker after a certain stage of pregnancy will not be subject to any disqualification under ... the Law.

5. If an individual accepts a maternity leave of absence for a definite period, the Commission's policy governing leaves of absence will be followed if a claim is filed prior to the expiration thereof or after the claimant does not report back for duty.

(Unemployment Compensation Instruction MC–135 dated October 16, 1972. This document has not been superceded.) [9]

A document routinely distributed to claimants for unemployment compensation by employees of the South Carolina Employment Security Commission describes Commission policy as follows:

The South Carolina Employment Security Law provides in Section 41–35–120(1)

---

9. A review of decisions introduced into evidence in this case reveals the Commission's policy regarding maternity leaves of absence. In brief, a claimant will be denied unemployment compensation if there is no job available for her when she returns to work after maternity leave if (1) her leave did not have a definite termination date (Decisions # 78–a–278 and # 78–a–617), or (2) *if she attempts to return to work prior to the end of her maternity leave* (Decision # 78–A–98). If the employer's policy is not to provide workers with maternity leave, no benefits are paid despite the fact that an individual claimant is able to work and available for work (Decision # 78–A–194).

that if the Commission finds that a claimant voluntarily left his most recent employment without good cause, such claimant shall be ineligible for benefits from the effective date of the claim and continuing until he has performed services in covered employment for one or more employers and has earned wages for such services in an amount equal to not less than eight times the weekly benefit amount established for such individual. The South Carolina Supreme Court has interpreted the words "good cause" to mean a cause attributable to or connected with the claimant's employment.

Personal reasons, therefore, do not constitute good cause for quitting. Examples of such personal reasons are as follows:

   *     *     *     *     *     *

(d) Due to pregnancy.

   *     *     *     *     *     *

The individual who quits because he is dissatisfied with his job or for personal reasons as stated above will be disqualified for quitting without good cause.
(document UCB–236, Rev. 11/77)

These policies are applied more or less uniformly in all pregnancy–related cases.[10] They were used to disqualify indefinitely both plaintiffs from receipt of unemployment compensation benefits. They are also applied on all levels of the decision–making process and in a wide variety of factual settings. The policies were effectuated, for example, in a case decided by the Commission itself. In that case, the Commission imposed an indefinite disqualification on a female security guard who left work to get away from an x–ray machine. After becoming pregnant, the woman was informed by her doctor that she could not continue working around x–rays. The employer had no other job available for the woman. Nonetheless, the Commission found "her reason for quitting was not connected to or attributable to her employment" and an indefinite disqualification from receipt of unemployment compensation was imposed (Decision # 79–C–265).

In another case, a woman's maternity leave had been rescinded by her employer. The company only granted leaves to workers after they had been with the firm for more than one year. The woman had been with the company for nine months. After having her child, the claimant was disqualified from receipt of unemployment benefits by an appeals referee for the Commission for having voluntarily quit her most recent work without good cause (Decision # 78–A–2403).

An additional application of the Commission's policies was made in case # 78–A–4510. In that case, a legal secretary had become pregnant and was granted a maternity leave. The law firm for which she worked dissolved during her absence and there was no work available for her at the end of her leave. An appeals referee stated that:

> Had claimant not been on maternity leave at the time the law partnership was dissolved, she would have been laid off due to lack of work, and would therefore have been eligible for benefits. However, since she was on pregnancy leave, at the time, she does not qualify for benefits. Her separation is considered to have been the result of personal factors.

An indefinite disqualification was imposed.

Another case involving the challenged policies contains the following findings of

---

**10.** Although the stated policy says that a woman who is fired because she was pregnant should receive benefits, some women found to have been discharged from their jobs because of pregnancy have been disqualified from aid under the "misconduct" provision of S.C.Code Ann. § 41–35–120(2). In the case of one Minnie S....., a claims adjudicator, on May 20, 1980, found that a claimant who left work four days before the birth of her child should be disqualified under the "misconduct" subsection because Mrs. S.....'s "[a]bsenteeism, although for compelling reasons, shows a disregard for employer's interest." In Decision # 78–A–1732, a disqualification was imposed upon a woman who was discharged even though "... her reasons for being absent were of a compelling nature...." In addition, Decision # 78–A–5528, involving a woman who was fired by her employer because she was hospitalized for five days for pregnancy–related testing, imposed disqualification on a finding that the woman had been discharged for work connected cause.

fact by an appeals referee for the Commission:

> The employer had a policy for some of its departments requiring that employees immediately report pregnancy. This policy was necessitated by the existence of some evidence that materials used in those departments could be harmful to a human fetus.

> Claimant was aware of this evidence of the possibility of harm to her baby. Claimant indicated this concern to her employer and separation took place on mutual agreement between herself and the employer and involved medical personnel. Employer conceded that legitimate evidence does exist which would tend to reinforce claimant's concern.

In the face of these findings, the appeals referee imposed a disqualification. The disqualification was for a five–week period. (The initial claims adjudication had imposed an indefinite disqualification as required by S.C.Code Ann. § 41–35–120(1)). (Decision # 79–A–549.)

The Commission's policy also was given effect in the case of a nurse's aide who refused a 90–day maternity leave; she believed it too short because she had encountered complications associated with her pregnancy. Three weeks after resigning, she suffered a miscarriage. When she returned to her prior employer, there was no work available for her. She was disqualified indefinitely from receipt of unemployment compensation (Decision # 78–A–3376).

### Receipt of Federal Funds

The South Carolina Employment Security Commission receives approximately 25 million dollars per year from the United States Department of Labor to pay for the cost of administering this State's unemployment compensation program. Accordingly, policies and practices must conform to the "fundamental standards" set out in relevant federal laws.

## CONCLUSIONS OF LAW

### Jurisdiction

This court has personal jurisdiction over all of the defendants. It also has subject matter jurisdiction over the matters at issue in this action pursuant to 28 U.S.C. § 1337, 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3) and (4), providing for jurisdiction in District Court for claims arising out of violations of 42 U.S.C. § 1983. Jurisdiction also exists pursuant to the doctrine of pendent jurisdiction.

### Class Certification

All of the prerequisites of a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure have been met in this action.[11]

The class certified in this action is described as being composed of:

> Those workers who have been, are or will be insured under the South Carolina Employment Security law, who became or will become pregnant and thereafter whose employment terminated or will terminate for reasons arising out of their pregnancy, and who made or will make claims for unemployment compensation, who for any given week while their claim was, is or will be pending, were, are or will be able to work and available for work, and who were or would otherwise be disqualified from receipt of unemployment compensation benefits pursuant to S.C.Code Ann. § 41–35–120(1) or (2).[12]

---

11. This court has previously held that plaintiffs' claim for amounts withheld pursuant to the policies and practices challenged in this action is not barred by the Eleventh Amendment to the United States Constitution. *Order*, February 13, 1980.

12. To foreclose any possibility that women might be penalized inappropriately in the future, this class description includes imposition of a disqualification from unemployment benefits under either the "voluntary quit" provision or the "misconduct" provision of State law. A penalty based upon a finding that pregnancy–related absence from work constitutes "misconduct" would be as improper as one based on a finding that a woman who had to stop working because of the biological imperatives of pregnancy "voluntarily quit" her job.

As previously ordered by this court, plaintiff Liberia Johnson is fully qualified to serve as representative of the class of plaintiffs in this action.[13]

*Defendants' Systematic Denial of Unemployment Compensation to Women Because of Pregnancy Violates Federal Law.*

The first issue raised by the plaintiffs is whether the policies and practices of the South Carolina Employment Security Commission relating to pregnancy violate federal law. Pursuant to 26 U.S.C. § 3304(a)(12), a state unemployment compensation system must be designed to ensure that

> No person shall be denied compensation under such State Law solely on the basis of pregnancy or termination of pregnancy.

When Congress adopted 26 U.S.C. § 3304(a)(12), it imposed a sweeping ban on withholding unemployment compensation from women job seekers because they were pregnant when they left their most recent work. That a broad prohibition was intended can be readily seen if the statute is viewed in its proper historical context.

In evaluating historical context, it is important to recognize that the unemployment compensation system has undergone constant growth and development over the years.

The early history of federal involvement in unemployment compensation was detailed by the United States Supreme Court in *California Department of Human Resources v. Java*, 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971). When originally adopted, the unemployment insurance program was designed

to give prompt if only partial replacement of wages to the unemployed, to enable workers "to tide themselves over, until they get back to their old work or find other employment ...." Unemployment benefits provide cash to a newly unemployed worker "at a time when otherwise he would have nothing to spend," serving to maintain the recipient at subsistence levels without the necessity of his turning to welfare or private charity. Further, providing for "security during the period following unemployment" was thought to be a means of assisting a worker find substantial equivalent employment. The Federal Relief Administrator testified that the Act "covers a great many thousands of people who are thrown out of work suddenly. It is essential that they be permitted to look for a job. They should not be doing anything else but looking for a job ...."

*Id.* 131, 132, 91 S.Ct. 1354 (footnotes omitted)

In addition, the system was intended to stabilize industry in times of economic decline. As the then Secretary of Labor told Congress:

> I think that the importance of providing purchasing power for these people, even though temporarily, is of very great significance in the beginning of a depression. I really believe that putting purchasing power in the form of unemployment insurance benefits in the hands of people at the moment when the depression begins and when the first groups begin to be laid off is bound to have a beneficial effect. Not only will you stabilize their purchases, but through stabilization of their purchases, you will keep other industries from going downward,

---

**13.** Defendants' attempt at trial to relitigate the issue of whether plaintiff Johnson's separation was pregnancy-related cannot be properly considered by this court. The issue was conclusively determined in the administrative proceedings which preceded this litigation. As a matter of state law, the findings of fact of the agency in an unemployment claim are conclusive. *Hyman v. South Carolina Employment Security Commission*, 234 S.C. 369, 108 S.E.2d

554 (1959). Moreover, since defendants failed to dispute plaintiff Johnson's representativeness at an earlier hearing relating to her intervention in this action, they are estopped from raising the issue at this late hour.

While it further appears from the record that plaintiff Brown is also qualified to serve as representative plaintiff, that issue need not be decided here in light of the conclusion stated above.

and immediately you spread work by that very device."

*Id.* at 132, 91 S.Ct. at 1354.

Since enactment of the first unemployment compensation program, there have been enormous changes in the American economy and work force. To keep pace with these changes, Congress has necessarily adjusted the system periodically. Only through constant legislative adjustment in a changing economy can the system function and fulfill congressional objectives. Examples of these adjustments can be seen, for instance, in the post–Korean War provision of unemployment compensation for ex–servicemen (5 U.S.C. § 8521, *et seq.*); in provision of benefits to government employees (5 U.S.C. § 8501, *et seq.*); in provision of insured status to employees of certain non–profit organizations, state hospitals and institutions of higher education (26 U.S.C. § 3309(a)(1)(A) and (B)); and, during the periods of high and prolonged unemployment of the late 1960's and early 1970's, in passage of the Federal–State Extended Unemployment Compensation Act of 1970 and its subsequent amendments (26 U.S.C. § 3304, Note).

As increasing numbers of ex–servicemen entered the job market, as government employment grew even larger but less secure, as non–profit organizations proliferated, and as general unemployment grew, Congress took affirmative steps to make sure that otherwise employable individuals did not fall out of the mainstream of American economic life. It took these steps so that newly unemployed workers could avoid "turning to welfare or private charity" and thereby become members of a subterranean economy. *Id.* 132, 91 S.Ct. 1354. It did so because it recognized that it "is essential that they be permitted to look for a job." *Id.*

In recent years, increasing numbers of women–particularly in the past decade–have entered the labor force. Recognition of this change in the composition of the work force has *prompted congressional inquiry into the status of women workers and an examination of ways in which their participation in that arena can be encouraged.*[14]

One obvious obstruction to women seeking equal partnership in economic life is that arising out of their unique biological role as childbearer. Indeed, even a cursory reading of the administrative decisions introduced into evidence in this case illustrates the premise that the process of bringing children into the world creates special problems for women who seek to have an economic role as well as a maternal one.

Congressional inquiry into the status of women in the work force was prompted in part by the United States Supreme Court. In *Turner v. Department of Employment Security and Board of Review of the Industrial Commission of Utah*, 423 U.S. 44, 96 S.Ct. 249, 46 L.Ed.2d 181 (1975), the Court addressed one of many problems confronting women workers. Until the *Turner* decision was rendered, many unemployment compensation administrators automatically presumed that pregnant women could not work. Based upon that presumption, pregnant women were routinely held to be ineligible to receive unemployment benefits. The U.S. Supreme Court abruptly halted this practice in *Turner.*

So far as it went, the *Turner* case was a positive step in removing barriers to the participation of women in the labor market. But the decision left important problems unresolved.

It is an inevitable part of pregnancy that there are physiological and biological changes in the expectant mother. It is also an inevitable part of pregnancy that the health and safety of the life growing within the woman can be affected by the external environment. Additionally, in our culture, it is an inevitable part of pregnancy that a woman must take time off from work to have a child. The biological imperatives of pregnancy, therefore, require women to seek a hiatus from participation in the work

**14.** Congress has acted in other ways to encourage participation of workers in the national economy. The Civil Rights Act of 1964, for example, was designed to remove impediments to full participation in the labor force by minorities and women.

force. The time at which this hiatus is sought will, quite naturally, vary from individual to individual depending upon the circumstances. Some employers try to accommodate these needs and provide maternity leaves. Unfortunately, this accommodation is not universal. In cases where the employer makes no accommodation, another inevitability enters the picture. There is a termination of employment and attendant loss of income when the woman joins the ranks of the unemployed. When a woman returns to the job market after having a child, she and her family can suffer real economic hardship if her employer does not re-hire her and she cannot collect unemployment compensation. The *Turner* decision did not settle the question of whether women faced with these circumstances could be denied unemployment compensation.

It was in this historical context and faced with this unanswered question that Congress passed 26 U.S.C. § 3304(a)(12). Relying upon its power to impose "fundamental standards" on all unemployment insurance programs, Congress prohibited *denial* of benefits to women because of pregnancy or its termination. The primary issue to be decided by this court is whether Congress, in its wisdom, answered the question that *Turner* did not address. Because this statute imposes a "fundamental standard," appropriate deference must be given by this court to insure that its full sweep and scope are achieved.[15]

By choosing to impose a "fundamental standard" upon the States, Congress obviously believed that it was addressing a problem of major proportions, significantly affecting large numbers of women in the work force. The device it used and the words it selected make this conclusion inescapable. It said, in imposing a "fundamental standard," that:

> No person shall be denied [unemployment] compensation . . . solely on the basis of pregnancy or termination of pregnancy.

In plain, unambiguous language, Congress imposed a sweeping ban on the use of pregnancy or its termination as an excuse for *denying* benefits to otherwise eligible women. These plain words must necessarily be construed to convey their ordinary meaning. *State of Maine, et al. v. Thiboutot, et vir., etc.,* —— U.S. ——, 100 S.Ct. 2502, 65 L.Ed.2d 555; *Dobbs v. Train,* 409 F.Supp. 432 (D.Ga.1975), aff'd, 559 F.2d 946 (5th Cir. 1977); *Federal Ins. Co. v. Speight,* 220 F.Supp. 90 (E.D.S.C.1963). If Congress intended a more limited prohibition or carved out exceptions, it would not have imposed a "fundamental standard" using such broad and sweeping language. It would have relied upon much more specific language and used appropriately restrictive expressions.[16] *In re Nissen's Estate,* 345 F.2d 230 (4th Cir. 1965). The language it did use, however, obviously left no room for exceptions. It does not permit denial of benefits, as in South Carolina, solely because (1) a woman, for pregnancy-related, medical reasons, voluntarily left work to have a child rather than wait for her employer to fire her, (2) a woman was refused a maternity leave or her leave had no fixed terminal date, or (3) a woman attempted to return to her job either before or after her maternity leave was scheduled to expire. The plain and unambiguous words of the enactment do not contemplate consideration of such irrelevant factors.[17]

---

**15.** Precedent exists for reading "fundamental standards" in the context of unemployment insurance broadly. In *California Department of Human Resources v. Java,* 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971), judicial inquiry was made into the meaning of the mandate that each unemployment system must be designed to insure full payment of benefits "when due." In that case, the U. S. Supreme Court specifically rejected a narrow interpretation of the "when due" standard because narrow construction would frustrate the congressional objective of guaranteeing early replacement of lost wages.

**16.** Appropriate words, for instance, to restrict the scope of the statute would have been "no person shall be found unable to work because of pregnancy or termination of pregnancy."

**17.** The statute at issue here is unambiguous on its face. Therefore, there is no real need to

■ The foregoing conclusion is supported by an additional consideration. Congress would not have expended any effort in this area unless it thought it necessary to remedy a problem.[18] The statute being examined by this court is remedial in nature and must, therefore, be broadly construed to reach the problem it sought to end. *Peyton v. Rowe*, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968); *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); *Wirtz v. Ti Ti Peat Humus Company*, 373 F.2d 209 (4th Cir. 1967), *cert. denied*, 389 U.S. 834, 88 S.Ct. 37, 19 L.Ed.2d 94.

The problem addressed by the statute under scrutiny was that the period of unemployment (and attendant wage loss), which necessarily accompanies pregnancy, can serve to force otherwise employable women out of the job market. Like all other unemployed workers, women who have stopped working to have a child can readily remain effective participants in the economy only if assistance is provided to encourage their return to work when they are physically able to do so. By providing partial wage replacement for pregnancy–related periods of actual unemployment,[19] Congress sought to facilitate the process of seeking reemployment. Absent some assistance, many women would be hampered in their effort to rejoin the work force. Absent, for example, some income to pay for child care expenses while looking for work, a woman cannot effectively compete in the employment process with others. If the statute is to fulfill the remedial purpose of encouraging a woman's search for a suitable job after having a child, it must be read to forbid the policies and practices complained of in this case. For it was those very policies which were used to deny plaintiffs the partial wage replacement that would have facilitated their job hunting efforts.

Defendants have urged this court to adopt a narrow view of the statute under

consider its legislative history. It is significant to note, however, that that history supports the conclusion stated above. In the Final Report of the House Ways and Means Committee which considered the bill, its authors indicated that the statute was proposed to outlaw state statutes viewed to be "inequitable" because they "deny benefits without regard to the woman's ability to work, availability for work, or efforts to find work." These eligibility factors, the authors believed, "make discriminatory disqualifications because of pregnancy unnecessary." H.R.Rep.No.94–755, 94th Cong., 1st Sess., p. 50 (1975).

18. Defendants have argued that 26 U.S.C. § 3304(a)(12) simply bans the states from presuming that pregnant women cannot work. This reading of the statute is inappropriate. It reduces the law to a simple codification of the *Turner* decision. Read so narrowly, the law has no independent force or effect. Congress should not, however, be presumed to have adopted useless or unnecessary legislation. *Jackson v. Kelly*, 557 F.2d 735 (10th Cir. 1977); *Knapczyk v. Ribicoff*, 201 F.Supp. 283 (D.Ill. 1962).

19. Congress has also acted to provide partial wage replacement for the period when a woman cannot work because of pregnancy. In an amendment to 42 U.S.C. § 2000(e), Congress has mandated that women not be excluded from receipt of disability insurance because they are unable to work due to pregnancy. This change in the Civil Rights Act assists women over an additional economic hurdle obstructing their participation in the marketplace. Like 26 U.S.C. § 3304(a)(12), the amendment forecloses the possibility that women would have to choose between a role as wage earner or a role as mother. Taken together, these two statutes implicitly preclude the possibility that harsh economic realities which would otherwise attend pregnancy will interfere with the right of working women freely to choose whether or not to have a child. *Cleveland Board of Education v. LeFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The fact that the language of 26 U.S.C. § 3304(a)(12) is coextensive with this fundamental constitutional right (reaching "pregnancy" and "termination of pregnancy") supports this conclusion.

In reaching this conclusion, this court is mindful of another historical and jurisprudential fact. In recent years, courts and Congress have expressly recognized that the issues involved in the process of bringing life into the world are of fundamental importance and require special consideration. For example, there has been recent recognition of the legitimacy of Congress' desire to promote and protect the role of women as mother as well as wage earner. *E. g., Harris v. McCrea*, — U.S. — , ——— ——— , 100 S.Ct. 2671, 2690–92, 65 L.Ed.2d 784.

examination and to sanction their practice of penalizing women because of pregnancy. They, of course, present various arguments in support of their views.[20] None of these arguments satisfactorily answers the question of why some women who have had a child should receive benefits while other women similarly situated should not.[21] The decision of when to stop working because of pregnancy necessarily will turn in each individual case on the facts and circumstances surrounding that particular pregnancy. Whether departure from work is prompted by environmental or health hazards on the job, complications arising out of pregnancy or the biological imperatives of childbirth, the decision to stop working must be left to the woman and her physician in each case. That medical decision must be respected. Whether the woman receives unemployment compensation when she can return to work cannot and should not turn, as in South Carolina, on the whim or calculations of the employer.

In conclusion, an analysis of the historical context of unemployment compensation and the passage of 26 U.S.C. § 3304(a)(12) supports plaintiffs' contention that the remedial legislation at issue in this case was intended to and plainly did address an issue inevitably touching a major part of the American work force. As part of the process of bringing women into full partnership in American economic life, Congress continues a trend which began with passage of the first unemployment compensation law and which is ongoing. It has and continues to adjust the law to match the present day realities of our economy.

■ Based on the foregoing, it is the finding of this court that the policies and practices of the South Carolina Employment Security Commission which disqualify otherwise eligible women from receipt of unemployment compensation because of pregnancy are in direct contravention of 26 U.S.C. § 3304(a)(12). Accordingly, those policies and practices must be enjoined. Additionally, the class of plaintiffs are entitled to relief prospectively and, to the extent practicable, retrospectively. Because this court recognizes that (1) the cost of locating many class members disqualified prior to the effective date of 26 U.S.C. § 3304(a)(12) may be difficult, and (2) the amount of any individual claim is relatively small, granting retroactive relief to those disqualified prior to January 1, 1978, would be so cost ineffective as to be inequitable. Accordingly, retrospective relief is limited to those otherwise eligible applicants disqualified from receipt of unemployment compensation because of pregnancy since January 1, 1978. Further, it is the view of this court that the named plaintiffs in this action and other class members to be identified by name during the course of this litigation are specifically entitled to retrospective relief.

---

**20.** During the course of this litigation, the U.S. Department of Labor has been silent regarding its position on the issues before the court. At trial, however, defendants produced a copy of a letter from the Labor Department dated July 9, 1980. The location of the original letter is unknown. The copy of the letter set forth the conclusion that the challenged policies of the South Carolina Employment Security Commission are consistent with the Labor Department's understanding of 26 U.S.C. § 3304(a)(12). While due deference is generally given to agency opinions by courts (*Skidmore v. Swift Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944)), in this case we find the evidence of the agency's view unpersuasive. It does not discuss the policies or issues involved in this litigation and cites no cases to support its conclusions. It also discusses concerns of the Labor Department clearly not at issue in this case; for example, the prospect that benefits would be paid to women who are not able to work should the plaintiffs prevail. As the foregoing discussion reveals, this latter concern is an unreal one. Finally, no evidence was introduced indicating what information had been given to the Labor Department by defendants which led the agency to reach the conclusion it expressed in its letter.

**21.** Plaintiffs have argued that this disparate treatment of otherwise identically situated women violates the Equal Protection Clause of the Fourteenth Amendment. Because this court finds for plaintiffs on statutory grounds and because, for equitable and practical reasons, retroactive relief is to be limited to the effective date of the statute (making independent relief on constitutional grounds unavailable), this court finds it unnecessary to reach this and plaintiffs' other constitutional claims.

## ORDER

In accordance with the preceding rationale, and to remedy the violations of law occasioned by the policies and practices of the South Carolina Employment Security Commission complained of in this action, it is hereby

## ORDERED, ADJUDGED AND DECREED, that:

### Prospective Relief

(1) The policies and practices of the South Carolina Employment Security Commission are declared to be in direct contravention of 26 U.S.C. § 3304(a)(12); [22]

(2) That the defendants and the South Carolina Employment Security Commission are permanently enjoined from formulation or implementation of any policy or engaging in any practice which disqualifies otherwise eligible women from receipt of unemployment compensation pursuant to S.C. Code Ann. § 41–35–120(1) or (2) because those women left their most recent work for pregnancy–related medical reasons.

(3) That the defendants and the South Carolina Employment Security Commission are ordered to make appropriate changes in their various regulations, manuals, notices, policy statements and other documents, whether used internally or distributed to the public, in a manner not inconsistent with this opinion, and furnish a copy of all such revised instruments to counsel for plaintiffs within thirty (30) days of the date of this order;

(4) That the defendants and the South Carolina Employment Security Commission are ordered to furnish unto counsel for the plaintiffs copies of all decisions, including those of claims adjudicators, appeals referees or commissioners of the South Carolina Employment Security Commission, regarding women who were pregnant when they left their most recent work for a period of one (1) year following the date of this order;

(5) That the defendants and the South Carolina Employment Security Commission are ordered to post notices in each of their several offices throughout the State of South Carolina informing the public of this litigation and its outcome. The content of this notice is to be agreed upon by counsel for the respective parties within thirty (30) days of the date of this order;

(6) That the defendants and the South Carolina Employment Security Commission are ordered to amend the document now characterized as UCB–236 to make an affirmative statement that leaving one's most recent work due to pregnancy–related medical problems *is* good cause for voluntarily quitting an employment within the meaning of the South Carolina Employment Security law. Counsel for the respective parties shall agree upon the content of said affirmative statement within thirty (30) days of the date of this order.

### Retrospective Relief

(1) The South Carolina Employment Security Commission shall pay unto the named plaintiffs and class members whose identities became known at trial an amount equal to the sum of the weekly benefit amount to which each was entitled times the number of weeks each was unemployed and eligible for benefits, minus a credit for any such amount already paid.

(2) The defendants and the South Carolina Employment Security Commission shall identify to counsel for plaintiffs within ninety (90) days of the date of this order all women who were pregnant when they left their most recent work, but whose applications for unemployment compensation were denied since January 1, 1978. Counsel for plaintiffs shall have access to the records of the Employment Security Commission regarding all those so identified.

(3) Within one hundred and twenty (120) days of the date of this order, counsel for the respective parties shall agree upon a

22. As previously noted, because no independent relief is available and because plaintiffs have prevailed on the merits of their statutory claim, this court does not reach the constitutional issues pressed by plaintiffs.

listing of those persons identified pursuant to the preceding paragraph as to which ones shall be mailed written notice. Within thirty (30) days thereafter, those persons who are to receive notice shall be mailed, by first class mail, notice of this litigation and its outcome and of the individual's presumptive right to receive retroactive unemployment compensation benefits. Names and addresses of persons receiving such notices shall be mailed by first class mail to counsel for the plaintiffs. The content and form of said notice shall be agreed upon between counsel for the respective parties within thirty (30) days of the date of this order;

(4) The South Carolina Employment Security Commission shall pay to all those who respond to the aforedescribed notice within ninety (90) days of its mailing an amount equal to the sum of the weekly benefit amount to which each individual was entitled multiplied by the total number of weeks each was unemployed and eligible for benefits, minus a credit for any such amounts already paid to any individual. Such payments shall be made within thirty (30) days after receipt of a notice of claim from an individual.

(5) Defendants shall give notice to counsel for plaintiffs of any claim or a class member it seeks to contest. Notice is to be served on the individual class member and counsel for plaintiffs within one hundred and twenty (120) days of preparation of the list of potential class members set forth in paragraph number (2) of the Retrospective Relief section of this order. In the event there are any such challenges, individual hearings before a special master, to be appointed by this court, will be convened within sixty (60) days of receipt by the court of a notice or letter from such class member indicating a desire to contest the decision of the defendants or the South Carolina Employment Security Commission. As the contesting party, defendants will bear the burden of proving that the claimant is entitled to a lesser amount of benefits than otherwise presumptively due.

### Attorneys Fees

Plaintiffs, as prevailing parties, are entitled to recover their costs and reasonable attorneys fees. 42 U.S.C. § 1988. Plaintiffs are instructed to file their request for a specific amount, together with supporting affidavits and memoranda, within thirty (30) days from the date of this order. Defendants shall have thirty (30) days after service thereof within which to respond.

Plaintiffs are further entitled to additional attorneys fees for work performed in implementing this order, including matters relating to retrospective relief, and may apply to this court for payment of such additional fees at an appropriate time in the future.

### Time Limits

Any time limits established by this order can be extended or enlarged on application to this court and upon good cause shown or by consent of counsel for the respective parties.