INDUSTRIAL COMMISSION OF the STATE of Colorado (Ex-Officio Unemployment Compensation Commission of Colorado); and Division of Employment and Training, Colorado Department of Labor, Petitioners,

v.

Eudesimo ARTEAGA, Respondent.

INDUSTRIAL COMMISSION OF COLORADO (Ex-Officio Unemployment Compensation Commission of Colorado), and Division of Employment and Training, Colorado Department of Labor and Employment, Petitioners,

v.

Bahman ZANJANI, Respondent.

DIVISION OF EMPLOYMENT AND TRAINING, Petitioner,

v.

Manu YIADOM, and Industrial Commission of Colorado (Ex-Officio Unemployment Compensation Commission of Colorado), Respondents.

Nos. 85SC127, 85SC168 and 85SC210.

Supreme Court of Colorado, En Banc.

April 6, 1987.

Rehearing Denied April 27, 1987.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Christa D. Taylor, Asst. Atty. Gen., Human Resources Section, Denver, for petitioners.

David F. Steinhoff, Brian Patrick Lawlor, Colorado Rural Legal Services, Denver, for respondents.

William M. Bass, Denver, for amicus curiae Federation for American Immigration Reform.

Richard K. Willard, Asst. Atty. Gen., Thomas W. Hussey, Asst. Director, Ellen Sue Shapiro, Office of Immigration Litigation, Civ. Div., Dept. of Justice, Washington, D.C., for amicus curiae U.S.

Marcia Egger, New York City, for amicus curiae The Nat. Employment Law Project.

DUBOFSKY, Justice.

We granted certiorari to review the judgments of the court of appeals in three cases involving the eligibility for unemployment insurance benefits of alien claimants who had married United States citizens and whose petitions for legal permanent residence in the United States were pending before the United States Immigration and Naturalization Service (INS). *Arteaga v. Industrial Comm'n of State,* 703 P.2d 654 (Colo.App.1985); *Zanjani v. Industrial Comm'n of Colorado,* 703 P.2d 652 (Colo. App.1985); and *Division of Employment and Training v. Industrial Commission and Manu Yiadom,* No. 84-CA-799, unpublished (Colo.App. April 11, 1985).[1] In all of the cases, the INS had authorized the claimants to seek employment at the time they earned the wage credits required for unemployment compensation eligibility and when they applied for benefits. The Division of Employment and Training (the division) denied the claimants' request for unemployment benefits. The Industrial Commission (the commission) affirmed the division's denial of benefits in *Arteaga* and *Zanjani* and reversed the division's denial in *Yiadom.* The court of appeals determined that all of the claimants were "permanently residing in the United States under color of law" during the base periods used to determine eligibility for unemployment compensation under section 8–73–107(7)(a), 3 C.R.S. (1984 Supp.) and that

---

1. The court of appeals considered these cases separately. We consolidated the cases when we granted the separate petitions for certiorari. The court of appeals followed its rulings in *Arteaga v. Industrial Comm'n of State,* 703 P.2d 654 (Colo.App.1985) and *Zanjani v. Industrial*

*Comm'n of Colorado,* 703 P.2d 652 (Colo.App. 1985) in *Yatribi v. Indus. Com'n of State of Colo.,* 700 P.2d 929 (Colo.App.1985). The commission did not seek certiorari review in *Yatribi.*

they therefore were entitled to benefits.[2] We affirm the judgments of the court of appeals.

### I.

Eudesimo Arteaga, a citizen of Mexico, entered the United States without a visa in March, 1981. On April 26, 1982, he married a United States citizen. He was arrested two days later at his place of employment on suspicion of being in the country illegally. The INS commenced proceedings to deport Arteaga. On May 5, 1982, Arteaga's wife filed a petition with the INS requesting that the agency classify Arteaga as an immediate relative eligible for an immigrant visa. The INS released Arteaga from detention, granted him employment authorization and stayed deportation proceedings pending adjudication of the immediate relative petition. Arteaga apparently returned to his place of employment. The immediate relative petition filed by Arteaga's wife was granted on June 23, 1982, and Arteaga became a legal permanent resident on April 16, 1983. On June 13, 1983, Arteaga's Colorado employer terminated his employment. Arteaga filed for unemployment compensation benefits, basing his wage credit on wages earned from January 1, 1982, through December 31, 1982. The division denied benefits for wage credit earned prior to June 23, 1982, the date the petition filed by Arteaga's spouse was granted by the INS. The commission affirmed the division's denial of benefits.

Bahman Zanjani, a citizen of Iran, entered the United States in 1977, with a non-immigrant "F–1" student visa. On September 5, 1981, he married a United States citizen. On August 5, 1982, his wife filed a petition with the INS requesting that the agency classify Zanjani as an immediate relative. On that date the INS granted Zanjani employment authorization, and on October 25, 1982, the INS granted him immediate relative status. Zanjani was discharged from his job on July 13, 1983, and he filed a claim for unemployment compensation. The division denied benefits for wage credit earned by Zanjani before October 25, 1982, and the commission upheld the division's denial of benefits.

Manu Yiadom, a citizen of Ghana, arrived in the United States on March 18, 1977, as a visitor-for-pleasure with a "B–2" visa. He married a United States citizen on or about March 4, 1980, and on March 8, 1980, Yiadom's wife filed a petition with the INS requesting that the agency classify Yiadom as an immediate relative. The INS granted Yiadom employment authorization on that date. In August, 1983, Yiadom's then-estranged wife withdrew her petition, and the INS commenced deportation proceedings. Yiadom eventually was deported. From December, 1978, through October, 1982, Yiadom worked for a Colorado employer. His employment was terminated on October 31, 1982, and he filed for benefits in May, 1983. The division denied his claim, but the commission reversed the division's ruling and granted Yiadom wage credit beginning March 8, 1980, the date his wife filed her petition.[3]

Eligibility for unemployment benefits requires that a person have received wage credit for services performed during a base period.[4] The division initially determined

---

**2.** The Industrial Commission ruled in favor of the claimant in *Yiadom.* Thus, the division and not the commission petitioned for certiorari review in that case. Section 8–74–107(2), 3 C.R.S. (1984 Supp.) allows the division to seek appellate review of a commission ruling.

**3.** On March 6, 1984, the commission decided that Arteaga was not entitled to wage credit from the date his wife filed her immediate relative petition because Arteaga entered the United States illegally. On May 3, 1984, the commission decided Zanjani was not eligible for wage credit from the date his wife filed her immediate relative petition although his entry into the United States was legal. On May 24, 1984, the

commission determined that Yiadom was eligible for wage credit from the date his wife filed her immediate relative petition because he legally entered the United States. The commission's rulings in these cases are not consistent.

**4.** "Base period" means the first four of the last five completed calendar quarters immediately preceding the first day of the individual's benefit year. § 8–70–103(1), 3B C.R.S. (1986). Any two consecutive quarters of earnings in the base period may be sufficient work history on which to base monetary eligibility for unemployment compensation. §§ 8–73–102 and –107(1)(e), 3B C.R.S. (1986).

that the claimants had sufficient wage credits to be eligible for benefits. Later the division reversed itself because the credits were earned before the INS granted the petitions filed by the claimants' spouses. The issue in these cases is whether an alien claimant is entitled to credit for quarters of service earned while the claimant was married to a citizen of the United States, working for a Colorado company under authorization from the INS, and waiting for the INS to grant a petition for legal permanent resident status.

The court of appeals held that Arteaga was entitled to unemployment compensation under section 8–73–107(7)(a), 3 C.R.S. (1984 Supp.), because he met the statutory criterion of "permanently residing in the United States under color of law." The factors supporting its decision that Arteaga's residence was permanent were his marriage to a citizen of the United States, his employment with a domestic company under authorization from INS, and his pending application for legal permanent residence, notwithstanding the INS' continuing power to deport him. The court determined that Arteaga was "permanently residing in the United States under color of law" because the INS was aware of his technically illegal presence and yet consented to it by suspending efforts to deport him and by authorizing him to work. The court of appeals concluded that Arteaga was entitled to wage credit from the date he applied for legal permanent residence and obtained work authorization from the INS. The court of appeals applied the reasoning in Arteaga's case to Zanjani's and Yiadom's claims.

## II.

The Colorado Employment Security Act (CESA), §§ 8–70–101 to 8–82–105, 3B C.R.S. (1986), is designed to lighten the burden of unemployment "which ... falls with crushing force upon the unemployed worker and his family." § 8–70–102, 3B C.R.S. (1986). *See also California Human Resources Department v. Java,* 402 U.S. 121, 131–132, 91 S.Ct. 1347, 1353–1354, 28 L.Ed.2d 666 (1971); *Salida School District R–32–J v. Morrison,* 732 P.2d 1160, 1164

(Colo.1987). The CESA establishes a mechanism by which funds are accumulated to provide compensation for a limited time to those who are involuntarily unemployed through no fault of their own. § 8–73–108(1)(a), 3B C.R.S. (1986); *Salida School District R–32–J v. Morrison,* at 1164; *Industrial Commission v. Moffat County School District RE# 1,* 732 P.2d 616, 620–621 (Colo.1987); *Harding v. Industrial Commission,* 183 Colo. 52, 515 P.2d 95 (1973); *Andersen v. Industrial Commission,* 167 Colo. 281, 447 P.2d 221 (1968). A claimant who receives unemployment compensation is entitled to a statutorily prescribed unemployment benefit that is less than his salary and lasts for a limited time. §§ 8–73–102 and 8–73–104, 3B C.R.S. (1986); *Salida School District R–32–J,* at 1164.

Unemployment compensation is a cooperative federal-state program. The federal government offers incentives to the states to encourage them to enact unemployment insurance programs that conform to federal statutory requirements. Thus, each state has a comprehensive statute like the CESA governing the program within that state, but federal statutes define the basic outlines of the unemployment insurance system. Included in the congressional incentives are certain tax credits for employers. The Federal Unemployment Tax Act (FUTA), 26 U.S.C. §§ 3301–3311 (1976 & Supp.1986), imposes on employers in participating states a tax representing a percentage of total wages paid by the employers during the calendar year and representing the number of former employees collecting unemployment insurance, the employer's experience rating. *See* 26 U.S.C. § 3303(a)(1) (1976); §§ 8–76–102 to –104, 3B C.R.S. (1986). If the United States Secretary of Labor "certifies" a state to the Secretary of the Treasury, *see* 26 U.S.C. § 3304(a)–(c) (1976 & Supp.1986), employers in that state may obtain a credit of up to ninety percent against their basic FUTA tax liability for unemployment taxes paid to the state unemployment fund.

To be "certified" by the Secretary of Labor, the state unemployment compensa-

tion law must conform to certain minimum standards. Relevant to this case, the state law must contain the provisions found at 26 U.S.C. § 3304(a)(14) (1976). Section 3304(a)(14)(A) generally prohibits the payment of unemployment compensation to aliens, but permits such payment if certain requirements are met:

> Compensation shall not be payable on the basis of services performed by an alien unless such alien is an individual who was lawfully admitted for permanent residence at the time such services were performed, was lawfully present for purposes of performing such services, or was permanently residing in the United States under color of law at the time such services were performed (including an alien who was lawfully present in the United States as a result of the application of the provisions of section 203(a)(7) or section 212(d)(5) of the Immigration and Nationality Act),....

26 U.S.C. § 3304(a)(14)(A) (1976).[5] The CESA contains the requirements of section 3304(a)(14)(A) in section 8–73–107(7)(a), 3 C.R.S. (1984 Supp.). Section 8–73–107(7)(a) is identical to the federal provision except that it refers to "benefits" payable instead of "compensation" payable.[6]

Under section 3304(a)(14)(A), unemployment compensation is available to an alien who was "lawfully admitted for permanent residence at the time such services were performed," "was lawfully present for purposes of performing such services," or "was permanently residing in the United States under color of law at the time such services were performed." An individual who "was lawfully admitted for permanent residence" is one who has the privilege of residing in the United States permanently as an immigrant. 8 U.S.C. § 1101(a)(20) (1976). An individual who was "lawfully present for purposes of performing ... services," according to the generally accepted interpretation of this phrase at the time the instant cases arose, was a Canadian or Mexican resident not actually residing in the United States but legally working in the United States. *See* Emergency Unemployment Compensation Extension Act of 1977, Pub. L. No. 95–19, § 302(a), 91 Stat. 39, 44 (1977); S.Rep. No. 95–67, 95th Cong., 1st Sess. 14 (1977); H.R. Conf.Rep. No. 95–158, 95th Cong., 1st Sess. 103 (1977), U.S.Code Cong. & Admin.News 1977, p. 79.[7]

The phrase "permanently residing in the United States under color of law" is not

---

5. Sections 203(a)(7) and 212(d)(5) were intended when enacted to apply to Cuban refugees who had been admitted to the United States after 1965 as "conditional entrants." *Berger v. Heckler*, 771 F.2d 1556, 1572–1574 (2d Cir.1985). Section 203(a)(7) was codified at 8 U.S.C. § 1153(a)(7) (1976 & Supp.1986), and it permitted the United States Attorney General to regulate the conditional entry of refugees. *Holley v. Lavine*, 553 F.2d 845, 851 (2d Cir.1977), *cert. denied*, 435 U.S. 947, 98 S.Ct. 1532, 55 L.Ed.2d 545 (1978). 8 U.S.C. § 1153(a)(7) was repealed by the Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102 (1980). *Sudomir v. McMahon*, 767 F.2d 1456, 1460 n. 5 (9th Cir.1985). Section 212(d)(5) is codified at 8 U.S.C. § 1182(d)(5)(A), (1970 & Supp.1986) and it permits the Attorney General in his discretion to parole into the United States temporarily an otherwise inadmissible alien. *Id.*

6. Section 8–73–107(7)(a), 3 C.R.S. (1984 Supp.), provides: "Benefits shall not be payable on the basis of services performed by an alien unless such alien is an individual who is lawfully admitted for permanent residence at the time such services were performed, was lawfully present for purposes of performing such services, or was permanently residing in the United States under color of law at the time such services

were performed (including an alien who was lawfully present in the United States as a result of the application of the provisions of § 203(a)(7) or § 212(d)(5) of the "Immigration and Nationality Act")."

7. After the court of appeals' decisions in the cases before us, the United States Department of Labor interpreted the phrase "lawfully present for purposes of performing such services" as including "other aliens who are permitted to work by the INS regardless of their status in the United States." Unemployment Insurance Program Letter No. 1–86 (issued October 28, 1985), 51 Fed.Reg. 29,713 (1986). Although it appears from the letter that the Department of Labor has directed all states to award unemployment compensation benefits to aliens who had work authorization at the time they earned wages credits, that interpretation of the law was not in effect at the time the claims in these cases arose. Therefore, we need to address the question that was before the court of appeals and determine if the claimants were individuals who were "permanently residing in the United States under color of law at the time [their] services were performed."

defined in section 3304(a)(14)(A) [8] nor in the version of section 8–73–107(7)(a) in effect when these cases arose.[9] "Permanent," however, is defined at 8 U.S.C. § 1101(a)(31) (1970) as "a relationship of continuing or lasting nature, as distinguished from temporary, but a relationship may be permanent even though it is one that may be dissolved eventually at the instance either of the United States or of the individual, in accordance with law." The word "temporary" is not defined in the Immigration and Nationality Act; however, its meaning may be inferred from the act by usage of the words "temporary" and "temporarily" in reference to aliens who have no intention of abandoning their foreign residence, including tourists, students, and temporary workers and teachers. 8 U.S.C. § 1101(a)(15)(B), (F), (H) and (J) (1970 & Supp.1986).

The Court of Appeals for the Second Circuit supplied a definition for "under color of law" in *Holley v. Lavine,* 553 F.2d 845, 849–850 (2d Cir.1977), *cert. denied,* 435 U.S. 947, 98 S.Ct. 1532, 55 L.Ed.2d 545 (1978):

"Under color of law" means that which an official does by virtue of power, as well as what he does by virtue of right. The phrase encircles the law, its shadows, and its penumbra. When an administrative agency or a legislative body uses the phrase "under color of law" it deliberately sanctions the inclusion of cases that are, in strict terms, outside the law but are near the border.

There is no more common instance of action "under color of law" than the determination of an official charged with enforcement of the law that he, as a matter of public policy, will exercise his discretion not to enforce the letter of the statute or regulation because such enforcement would involve consequences, or inflict suffering, beyond what the authors of the law contemplated. The discretionary refusal of a prosecutor or like administrator of the law to use his enforcement powers is often not supported by specific language in a statute or other charter of authority. Yet there is a legion of adjudicated cases which recognize that the prosecutor or like enforcing official may exercise a discretionary power, virtually unreviewable by a court, *not* to enforce a statutory command, and *not* to seek the imposition of penalties or other sanctions upon a known violator. (Citations omitted.) [10] (Emphasis in original.)

---

**8.** Congress recently again chose not to define "permanently residing in the United States under color of law." *See* Immigration Reform and Control Act of 1986, P.L. 99–603 (enacted November 5, 1986); 10A U.S.C. Cong. & Ad.News (Dec.1986).

**9.** The General Assembly modified section 8–73–107(7)(a) in 1985. *See* H. 71, sec's 3, 4, § 8–73–107, 1985 Colo.Sess.Laws 366–367; § 8–73–107(7)(a), 3B C.R.S. (1986). The new version of the statute adds the following language:

For purposes of the "Colorado Employment Security Act", "permanent resident under color of law" shall mean: (I) An alien admitted as a refugee under section 207 of the "Immigration and Nationality Act", 8 U.S.C. § 1157, in effect after March 31, 1980; (II) An alien granted asylum by the Attorney General of the United States under section 208 of the "Immigration and Nationality Act", 8 U.S.C. § 1158; (III) An alien granted a parole into the United States for an indefinite period under section 212(d)(5)(B) of the "Immigration and Nationality Act", 8 U.S.C. § 1182(d)(5)(B); (IV) An alien granted the status as a conditional entrant refugee under section 203(a)(7) of the "Immigration and Nationality Act", 8 U.S.C. § 1153(a)(7), in effect prior to March 31, 1980; (V) An alien who entered the United States prior to June 30, 1948, and who is eligible for lawful permanent residence pursuant to section 249 of the "Immigration and Nationality Act", 8 U.S.C. § 1259; or (VI) An alien who has been formally granted deferred action or non-priority status by the immigration and naturalization service.

With the exception of sub-sections (III) and (IV), which are the examples set out in 26 U.S.C. § 3304(a)(14)(A) (1986), the language in section 8–73–107(7)(a) as amended in 1985 does not appear in the FUTA. Because all claims in this case arose under the statute in effect in 1984, we express no opinion on the effect of the amendment.

**10.** The claimant for Aid to Families with Dependent Children (AFDC) benefits in *Holley v. Lavine,* 553 F.2d 845 (2d Cir.1977), was a Canadian citizen who overstayed her non-immigrant visa, married and had six children born in the United States. The state agency considering the claimant's request denied benefits because of her immigration status, despite having received

The Second Circuit gave additional meaning to the "under color of law" language in *Berger v. Heckler,* 771 F.2d 1556 (2d Cir. 1985):

> [T]he phrase is designed to be adaptable and to be interpreted over time in accordance with experience, developments in the law, and the like....
>
> ... "[T]he language ... invites dynamic interpretation by both courts and the administrative agency charged with the statute's enforcement to determine the statute's application in particular cases in the light of developments in the country's immigration policy." [11]

*Id.* at 1571, quoting appealed orders of the district court (E.D.N.Y.). The courts in both cases concluded that the claimants were entitled to welfare benefits as aliens "permanently residing in the United States under color of law."

The *Holley* rationale has been followed by other jurisdictions when confronted with similar issues regarding the eligibility of aliens for various benefits, especially unemployment benefits. *See Alfred v. Fla. Dept. of Labor and Employ. Sec.,* 487 So.2d 355 (Fla.App.1986) (unemployment benefits); *Vazquez v. Rev. Bd. of Indiana Emp. Sec. Div.,* 487 N.E.2d 171 (Ind.App. 1985) (unemployment benefits); *Cruz v. Commissioner of Public Welfare,* 395 Mass. 107, 478 N.E.2d 1262 (1985) (Medicaid benefits); *Flores v. Department of Jobs and Training,* 393 N.W.2d 231, *cert. granted* (Nov.1986) (Minn.App.1986) (unemployment benefits); *Papadopoulis v. Shang,* 67 A.D.2d 84, 414 N.Y.S.2d 152 (1979) (Medicaid benefits); *St. Francis Hospital v. D'Elia,* 71 A.D.2d 110, 422 N.Y.S.2d 104 (1979), *aff'd* 53 N.Y.2d 825,

440 N.Y.S.2d 185, 422 N.E.2d 830 (1981) (Medicaid benefits); *Gillar v. Employment Division,* 717 P.2d 131 (Or.1986) (unemployment benefits); *Rubio v. Employment Division,* 66 Or.App. 525, 674 P.2d 1201 (1984); *Lapre v. Department of Employment Security,* 513 A.2d 10 (R.I.1986) (unemployment benefits); *Antillon v. Department of Employment Security,* 688 P.2d 455 (Utah 1984) (unemployment benefits); *see also Ibarra v. Texas Employment Commission,* 645 F.Supp. 1060 (E.D.Tex. 1986) (unemployment benefits; settled by consent decree); *cf. Velasquez v. Sec. of Dept. of Health & Human Ser.,* 581 F.Supp. 16 (E.D.N.Y.1984) (given INS inaction to prosecute deportation, alien established eligibility for social security benefits); *but see Sudomir v. McMahon,* 767 F.2d 1456 (9th Cir.1985) (asylum applicants denied AFDC benefits); *Zurmati v. McMahon,* 180 Cal.App.3d 164, 225 Cal.Rptr. 374 (1986), *cert. denied* (Dec.1986) (*Sudomir* followed; asylum applicant denied unemployment benefits). In several cases courts determined that an alien was "permanently residing under color of law" when the INS had notice of the alien's presence and took no action to deport the alien. *E.g., Cruz,* 395 Mass. 107, 478 N.E.2d 1262; *Lapre,* 513 A.2d 10; *Antillon,* 688 P.2d 455.

Concern about the potential impact of allowing an alien to qualify for unemployment benefits if the INS had notice of the alien's presence and took no action to deport him led the United States Department of Labor to adopt an interpretation of section 3304(a)(14)(A) that would include aliens with authorization to work in the category of "lawfully present for purposes of performing ... services." Unemployment In-

---

a letter from the INS stating that deportation proceedings had not been instituted for humanitarian reasons. The letter specifically stated:

> [T]he Service does not contemplate enforcing her departure from the United States at this time. Should the dependency of the children change, her case would be reviewed for possible action consistent with circumstances then existing.

*Holley,* 553 F.2d at 850. "Permanently residing" language identical or similar to that found in section 8–73–107(7)(a), 3 C.R.S. (1984 Supp.), and 26 U.S.C. § 3304(a)(14)(A) (1976) is also

found in the federal statutes and regulations governing AFDC, *see* 42 U.S.C. § 602(a)(33) (1983 & Supp.1987), and Medicaid, 42 U.S.C. § 1396a (1987 Supp.); 42 C.F.R. § 436.402(b) (1986).

11. *Berger v. Heckler,* 771 F.2d 1556 (2d Cir. 1985), involved the "permanently residing under color of law" language found in 42 U.S.C. § 1382c(a)(1)(B)(ii) (1982) regarding the eligibility of certain aliens for Supplemental Security Income that is similar or identical to language in section 8–73–107(7)(a) (1984 Supp.) and 26 U.S.C. § 3304(a)(14)(A) (1986).

surance Program Letter No. 1–86 (issued October 28, 1985), 51 Fed.Reg. 29,713 (1986), *see* note 7, *supra.* Under the Department of Labor interpretation, beneficiaries of the INS' discretionary authority to permit an alien to work "for humanitarian reasons" pending determination of the alien's status may range from applicants for asylum or suspension of deportation to deportable or excludable aliens. The wage credits used to establish a claim must be earned while an alien is legally authorized to work in the United States. *Id.* Because the status of aliens in this category may depend upon many factors and also may be subject to change, each case must be reviewed carefully by the state agency to determine the alien's status both at the time of work and the time benefits are claimed. *Id.* The Program Letter in effect requires an affirmative case-specific or class-specific determination as to whether an alien was authorized to work before an alien may be eligible to receive unemployment compensation.

In a case decided shortly before the Department of Labor issued its Program Letter, *Esparza v. Valdez,* 612 F.Supp. 241 (D.Colo.1985), the United States District Court for the District of Colorado reflected a similar concern about allowing an alien to qualify for unemployment benefits if the INS had notice of the alien's presence and took no action to deport that alien. The court in *Esparza* interpreted the plaintiffs' claim as one that would permit any alien, without regard to the legality of his entry, to obtain a job, make his presence known to the INS by the filing of some application, and, in the absence of deportation, claim that his residence was "under color of law." The court determined that if the plaintiffs' common claim to the broad construction of the statute was accepted, all of the plaintiffs would be entitled to injunctive relief. Instead the court ruled, citing *Holley* approvingly, that section 3304(a)(14) requires individual consideration of the factual circumstances of each applicant to determine whether the applicant has an immi-

gration status that allows the applicant to remain in the United States for an indefinite period of time.

Claimants Arteaga and Zanjani in the instant case were named plaintiffs in *Esparza.*[12] The court in *Esparza* noted that none of the plaintiffs in that case had alleged that a state administrative tribunal, after a review of the factual circumstances of each case, had denied unemployment benefits during a period in which a plaintiff held an immigration status that allowed him to remain in the United States indefinitely. The court denied the individual claims for injunctive relief without prejudice to the merits of the claims.

In the case before us, the claimants have alleged that a state administrative tribunal, after review of the factual circumstances of each case, denied unemployment benefits for service during a period in which the claimants held an immigration status that allowed them to remain in the United States indefinitely. Their claims in this posture have merit. The INS Operations Instructions provide that no deportation proceeding should be initiated when a claimant establishes *prima facie* entitlement to an adjustment of status. INS OI 245.2(a). Arteaga, Zanjani and Yiadom established *prima facie* entitlement to an adjustment of status, under 8 C.F.R. § 145.1 and .2 (1986), when their citizen spouses presented proof of marriage to the INS and requested that the agency declare the claimants immediate relatives. *See* 8 U.S.C. § 1154 (1970 & Supp.1986) (procedure for granting immigrant status), 8 C.F.R. §§ 204.1 (immediate relative petition) and 109.1(b)(3) (1986) (employment authorization). The overwhelming majority of aliens who are legitimately married to United States citizens will be granted permanent residence status once their visa interview occurs. *See* INS OI 245.3(b). In fiscal year 1984, the INS approved ninety-six percent (96%) of the immediate relative petitions for permanent residence status. *Central Office—Statistical Analysis*

---

**12.** Kazimierz Kozak, one of the claimants in *Division of Employment and Training v. Industrial Commission,* 735 P.2d 469 (Colo.1987), also

was a named plaintiff in *Esparza v. Valdez,* 612 F.Supp. 241 (D.Colo.1985).

*Branch, Immigration and Naturalization Service, United States Dep't of Justice, Adjudication Summary Report for Fiscal Year 1984 (Form G22.2).* Moreover, in recognition of entitlement to an adjustment of status, the INS routinely grants work authorization to claimants whose spouses have filed the petitions.

One amicus in this case, the Federation for American Immigration Reform (Federation), argues that allowing the claimants to qualify for wage credits when they have filed petitions for adjustment of status and received work authorization would broaden the availability of unemployment compensation to aliens, thus enhancing the attractiveness of migrating illegally to the United States. The amicus informs us that the number of aliens for whom the INS adjusted status to legal permanent residence from a non-immigrant or deportable status grew from 26,001 in 1965 to 119,644 in 1983. *Immigration and Naturalization Service, United States Dep't of Justice, Statistical Yearbook of the INS,* 1965 and 1983. Because the increase in the numbers applying for permanent residence increased the workload of the INS, there was a commensurate increase in the time it took to process a petition for adjustment of status. Consequently, according to the Federation, the number of persons who ultimately may be deportable but who in the meantime are authorized to work in the United States continues to increase.

The Federation's argument might be relevant if this case involved entitlement to welfare benefits. *See Sudomir v. McMahon,* 767 F.2d 1456 (9th Cir.1985). However, the funds that provide unemployment compensation benefits are the proceeds of a tax paid by employers based on a percentage of wages paid to all employees and on each employer's experience rating. 26 U.S.C. § 3303(a)(1) (1976); sections 8–76–101 to 8–76–104, 3B C.R.S. (1986).[13] Contrary to the argument that providing unemployment benefits for aliens will increase the number of illegal aliens coming to this country, denying eligibility may induce employers to hire aliens who can never draw unemployment benefits because the employers of those aliens would receive reduced experience ratings upon which premiums are based and because unemployment insurance funds would receive premiums for insured workers who could never make a claim.[14] Moreover, if alien workers are not entitled to unemployment compensation when they leave a job because of poor working conditions, a situation that normally entitles a worker to benefits, substandard working conditions may become more prevalent, ultimately stimulating further illegal immigration. The United States Court of Appeals for the Ninth Circuit, in a case involving the availability of a back pay remedy under the National Labor Relations Act to illegal aliens who are victims of unfair labor practices, responded to an argument similar to the one made by the Federation. *Local 512, Warehouse and Office Workers' Union v. National Labor Relations Board,* 795 F.2d 705, 718–722 (9th Cir.1986). The court observed that back pay awards serve a public policy of deterring unfair labor practices and depriving employers who commit them of any competitive advantage, thus discouraging employers from hiring and exploiting undocumented workers to the detriment of both illegal aliens and American workers. *Id.*

We conclude that claimants are members of the working population intended to be covered by the unemployment compensa-

13. One federal court characterized the unemployment compensation system as similar to "a simple insurance system." *Brown v. Porcher,* 502 F.Supp. 946, 947 (D.S.C.1980), *aff'd,* 660 F.2d 1001 (4th Cir.1981), *cert. denied,* 459 U.S. 1150, 103 S.Ct. 796, 74 L.Ed.2d 1000 (1983). The court in *Porcher* said, "[E]mployer contributions to the unemployment trust fund can ... be fairly characterized as payments made in lieu of wages. It is not a 'welfare' system, but an entitlement system." 502 F.Supp. at 947. *See also, Berg v. Shearer,* 755 F.2d 1343 (8th Cir.

1985); *Wilkinson v. Abrams,* 627 F.2d 650 (3d Cir.1980).

14. Granting lower tax rates to employers with fewer employees who leave under conditions that qualify them for unemployment compensation enhances employment stability. *See* United States Department of Labor Unemployment Insurance Program Letter No. 29–83, Unemp.Ins. Rep. (CCH) ¶ 21,728 (1983).

tion system. The claimants, who had filed petitions for adjustment of status based upon their marriage to United States citizens and who had received work authorization from the INS, were persons "permanently residing in the United States under color of law." They should have received wage credits entitling them to unemployment compensation eligibility as of the date they filed their petitions and received work authorization.[15]

Judgments affirmed.[16]

ROVIRA, J., dissents, and
VOLLACK, J., joins in the dissent.

ROVIRA, Justice, dissenting:

The majority scrutinizes the phrase "permanently residing in the United States under color of law" as used in section 8–73–107(7)(a), 3 C.R.S. (1984 Supp.), and determines that this language, in the words of the Second Circuit, emits "penumbra" and "shadows" that call for a broad judicial

interpretation. Because I do not agree with this interpretation, I respectfully dissent.

### I.

The issue decided today has ramifications that extend beyond the facts of this particular case. The language in question arises from a provision of Colorado law, modeled after related federal legislation, that is intended to exclude all aliens from unemployment compensation except certain specified categories. *See* 26 U.S.C. § 3304(a)(14) (1982). The category at issue in this case covers aliens "permanently residing in the United States under color of law." The language used to describe this category is not unique to the state and federal unemployment compensation laws, but instead mirrors virtually identical language in similar statutes and regulations governing numerous government entitlement programs. *See* 42 U.S.C.A. § 602(a)(33) (1987) (Aid to

---

**15.** Yiadom ceased to "permanently reside in the United States under color of law" when the INS ordered him to present himself for deportation after an immigration judge had entered a deportation order. Yiadom's wage credits were earned, however, at a time when he was lawfully in the United States, and he was lawfully available for employment when the unemployment compensation benefits should have been paid. Therefore, despite his subsequent deportation, Yiadom is entitled to the unemployment benefits at issue in this case.

**16.** Contrary to the allegations in the dissent, our holding is confined to the facts of this case. We rely on Judge Wyzanski's opinion in *Holley* for the definition of "permanently residing in the United States under color of law;" *Holley*, however, was a welfare benefits case and the only INS action was a letter stating that the INS would not seek to deport Mrs. Holley until her children were grown.

The instant case, involving applicants for unemployment compensation who have been granted authority to work in the United States by the INS, is nowhere near the outer limits (described by the dissent as when "the INS knows of an alien's illegal presence in the United States and has taken no action on the case") of *Holley*. The dissent finds its support in one case, *Zurmati v. McMahon*, 180 Cal.App.3d 164, 225 Cal.Rptr. 374 (1986), ignoring the overwhelming number of cases that have followed the *Holley* definition of "permanently residing under color of law."

The dissent's central concern appears to be speculative problems with potential alien eligibility for welfare benefits. It must be reiterated that

this case concerns unemployment compensation and unemployment compensation funds are not state and federal funds in the same sense as the dollars appropriated to fund welfare benefits. Both the state and the federal governments impose an unemployment tax on employers. The proceeds of the tax are deposited into the Federal Unemployment Trust Fund maintained by the United States Treasury. *See* 26 U.S.C. § 3302(a)(3)–(4) (1976); 42 U.S.C. § 1104 (1982). An appropriation in an amount equal to the proceeds of the tax funds administrative costs of state programs administered in conformity with federal statutory requirements. *See* 42 U.S.C. §§ 502, 1101 (1982 & Supp.1987). Moreover, should the INS become overly concerned about the numbers of people seeking what the Federation and the dissent describe as "entitlement benefits," it could begin a new policy of immediately deporting all aliens who do not have permanent legal resident status (including persons married to United States citizens and asylum applicants), requiring them to wait abroad for the processing of their applications, and allowing them to come back to the United States only when the INS has issued the documents giving them status as permanent legal residents. Instead, the INS recently proposed granting blanket work authorization for illegal aliens who intend to seek legal status under the new federal immigration law that allows illegal aliens who have resided continuously in the United States since January 1, 1982, to remain here. 52 Fed.Reg. 8762, 8764 (1987).

Families with Dependent Children); 42 U.S.C. § 1382c(a)(1)(B) (1982) (Supplemental Security Income for the Aged, Blind, and Disabled); Rule 3.140.11, 9 C.C.R. 2503–1 (1980) (Public Assistance); Rule 3.380.15, 9 C.C.R. 2503–1 (1980) (Old Age Pensions); Rule 3.400.16, 9 C.C.R. 2503–1 (1979) (Aid to Needy, Disabled or Blind Persons); Rule 3.600.21, 9 C.C.R. 2503–1 (Aid to Families with Dependent Children); Rule 8.100.53, 10 C.C.R. 2505–10 (1986) (Medical Assistance). This case represents our first opportunity to construe the pertinent language. As a result, our decision will likely influence decisions in future cases involving the eligibility of aliens for a variety of government benefits.

The precedent set by today's decision is especially troubling because the questions surrounding alien eligibility for government benefits are bound to intensify.[1] Amicus informs us that immigration to the United States is now at or near the highest level in the history of the country and increasing rapidly. Estimates of illegal aliens now living in this country range well into the millions. According to amicus, in the state of Colorado alone, in 1984 the Immigration and Naturalization Service estimated that 5,328 illegal aliens could be screened off the unemployment compensation rolls for a first-year savings to the state and federal governments of $2.9 million. The majority's opinion in this case, because it has the potential to greatly expand the eligibility of aliens for government benefits and because that result may encourage further illegal immigration, can only exacerbate a growing problem faced by officials charged with administering and financing state entitlement programs.

## II.

The key problem that I see in the majority's analysis is the sheer breadth with which the majority defines the phrase "permanently residing in the United States under color of law." Initially, the majority concludes that the term "permanent" in

this context essentially refers to aliens who intend to abandon their foreign residence. Maj.Op. at 478. Then, relying on exceedingly broad language from *Holley v. Lavine*, 553 F.2d 845 (2d Cir.1977), *cert. denied*, 435 U.S. 947, 98 S.Ct. 1532, 55 L.Ed.2d 545 (1978), the majority concludes that an alien permanently resides "under color of law" if the federal Immigration and Naturalization Service knows the alien has no right to reside here but does not seek sanctions against the alien. Maj.Op. at 478–79.

In my view, this broad construction has the potential for creating serious difficulties. In *Esparza v. Valdez*, 612 F.Supp. 241, 244 (D.Colo.1985), a case involving two of the respondents now before this court, Judge Matsch clearly pointed out those difficulties:

> Adoption of [such a] position would seriously erode the government's ability to deal with the problem of illegal aliens. It would permit any alien, without regard to the legality of his entry, to obtain a job, make his presence known to the INS by the filing of some application, and, in the absence of deportation, claim that his residence was "under color of law." Congress has not indicated an intention to place such persons on the unemployment compensation benefits program.

*Esparza*, 612 F.Supp. at 244. *See also Zurmati v. McMahon*, 180 Cal.App.3d 164, 176–77, 225 Cal.Rptr. 374, 381 (1986).

To avoid this problem, Judge Matsch carefully crafted a narrower interpretation of the pertinent statutory language. In my view, he properly concluded that the phrase "permanently residing in the United States under color of law" makes eligible "those aliens who, after review of their particular factual circumstances pursuant to a specific statutory or regulatory procedure, have been granted an immigration status which allows them to remain in the United States for an indefinite period of time." *Esparza*, 612 F.Supp. at 244. Further, I believe this test, if properly applied, would exclude the

---

**1.** The increasing frequency with which the issue we address today is arising is demonstrated by the majority's listing of 14 cases all involving

similar statutory language and all dated 1979 or later. Maj.Op. at 479.

respondents from unemployment compensation coverage during the relevant periods at issue in this case.

In its decision, the majority purports to adopt and apply the test formulated in *Esparza*. However, in applying the test, the majority overlooks certain key language with the result that Judge Matsch's purpose in adopting the test is virtually cast aside. As I read it, the *Esparza* test clearly requires an alien to have official permission to remain indefinitely, granted under a specific statutory or regulatory procedure.

As other courts have put it, the "fundamental and essential requirement" is "an affirmative 'admission' or 'grant', by a competent official authority, of a specific status, which carries with it the right of the alien to reside in the United States for an indefinite period of time, so long as that status exists." *Zurmati v. McMahon*, 180 Cal.App.3d at 176, 225 Cal.Rptr. at 380–81. In other words, there must be an "official sanctioning" of the alien's presence and an "official determination" that the alien can remain indefinitely. *Sudomir v. McMahon*, 767 F.2d 1456, 1460 (9th Cir.1985). *See also Holley v. Lavine*, 553 F.2d 845 (2d Cir.1977), *cert. denied*, 435 U.S. 947, 98 S.Ct. 1532, 55 L.Ed.2d 545 (1978) (alien had received "official assurance" that INS did not contemplate enforcing her departure from the United States while her children remained dependent on her).

This interpretation finds support in the Colorado legislature's recent attempt to explicitly define the statutory phrase at issue in this case. *See* section 8–73–107(7)(a), 3B C.R.S. (1986). That definition is technically inapplicable to this case since it was adopted after this case arose. However, I believe it affords some insight into the legislature's original intent in adopting the ambiguous phrase "permanently residing in the United States under color of law." Importantly, in its definition, the legislature set forth—in accord with *Esparza* —specific categories involving "official sanctioning" of an alien's presence. However, none of the categories listed would, in my view, apply to the respondents.

In light of the "official sanctioning" test adopted by *Esparza* and related cases, the majority's attempts to categorize the respondents as "permanently residing in the United States under color of law" at the relevant intervals in this case are unpersuasive. While the respondents' applications for permanent residency status were pending, they had not been granted the permission to remain in the United States indefinitely under any specific regulatory procedure. Their applications for permanent residency status amounted to an attempt to obtain that permission; but until that permission was granted, petitioners remained only temporary residents.

In *Sudomir v. McMahon*, 767 F.2d at 1461–62, for instance, the Ninth Circuit addressed the comparable status of aliens who had applied for asylum and concluded that, "The status of asylum applicants and its duration can hardly be described as fixed, or permanent. To repeat, they are best described as inchoate." While the court found that "permanent" in the pertinent statutory language did not mean "forever," it also did not embrace "transitory, inchoate, or temporary relationships." It held that an alien's residence is temporary when the continued presence of the alien is solely dependent upon the possibility of having his application acted upon favorably. In this case, since the respondents' continued presence was solely dependent on favorable action on their application for permanent residency, their status must also be construed as "temporary."

Nor can the respondents claim that their marriages to American citizens elevated their status to aliens "permanently residing in the United States under color of law." Such marriages do not entitle an alien to an adjustment of his status to permanent resident. *Menezes v. INS*, 601 F.2d 1028, 1032 (9th Cir.1979). Indeed, in cases where an alien engages in a "sham" marriage to evade the immigration laws, the alien is subject to deportation. *Garcia-Jaramillo v. INS*, 604 F.2d 1236 (9th Cir.1979), *cert. denied*, 449 U.S. 828, 101 S.Ct. 94, 66 L.Ed.2d 32 (1980).

Similarly, the respondents did not receive official permission to remain indefinitely because they received authorization to work. Such work authorization is granted at the discretion of the INS, commonly for humanitarian purposes; it neither indicates nor confers legal status. *See* 8 C.F.R. § 109 (1987); *Zurmati v. McMahon*, 180 Cal.App. at 178, 225 Cal.Rptr. at 381–82. In fact, an alien may be granted authorization to work at a time when the government is attempting to deport him. *See, e.g.*, 8 C.F.R. § 109.1(b)(5) (1987).

### III.

In its opinion, the majority places great emphasis on a recent interpretation by the federal Department of Labor that aliens who are granted work authorization are eligible for unemployment compensation under a separate statutory category permitting coverage of aliens "lawfully present for purposes of performing ... services." Maj.Op. at 479–80. The majority, however, does not point out that the Department of Justice views that ruling as "legally incorrect." [2] Even if it were correct, however, the Department of Labor's view of that statutory category would be irrelevant since construction of the scope of that category is not an issue in this case. Maj.Op. at 477 n. 7.

What is highly relevant, however, is the department's interpretation of the language "permanently residing in the United States under color of law," and the very same ruling cited by the majority also interprets that language—but in a way contrary to the majority's interpretation:

The issue of whether an alien is permanently residing in the United States under color of law has been the subject of recent State appeals board and court decisions. Usually these cases concern aliens who entered the United States illegally, or who were lawfully admitted to the United States but not authorized to work during their stay. Later the alien may apply to the INS for permanent residence, political asylum, suspension of deportation or some other change in status. While a status determination is pending or deportation proceedings are being considered, the alien may file a claim for unemployment compensation. In some (but not all) of these cases, appeals boards or courts have ruled that if the INS knows of an alien's illegal presence in the United States and has taken no action on the case, the alien is "permanently residing in the United States under color of law."

Rulings of this type do not conform with the intent of Section 3304(a)(14)(A), FUTA, or its legislative history. INS inaction is *not* sufficient to show that an alien is present under color of law and States may not interpret it as such.

Unemployment Insurance Program Letter No. 1–86 (issued October 28, 1985), 51 F.R. 29713, 29716 (August 20, 1986).

The majority's reliance on *Holley v. Lavine*, 553 F.2d 845 (2d Cir.1977), *cert. denied*, 435 U.S. 947, 98 S.Ct. 1532, 55 L.Ed.2d 545 (1978), is similarly misplaced.

---

**2.** In a letter to the deputy solicitor of the Department of Labor dated February 5, 1986, a Justice Department assistant attorney general strongly urged that the Labor ruling be rescinded and pointed out that:

The legislative history surrounding the inclusion of this phrase indicates that Congress intended it to refer to certain classes of Mexican and Canadian citizens present in this country to fill a specific category of jobs. Aliens permitted to work in order to support themselves while their applications for a status change are pending are not present in the United States for the purpose of performing services; they are permitted, for humanitarian reasons, to maintain themselves while their entitlement to remain in this country is in the process of adjudication. DOL's interpretation of this provision within FUTA is thus refuted by the legislative history and the plain meaning of the phrase itself.

With regard to the phrase "permanently residing in the United States under color of law," the letter stated:

The position of the United States on this issue is that no alien can be granted the status of a permanent resident under color of law, or be deemed eligible for benefits under federal social programs for any other reason, unless INS has made an affirmative, case-specific determination that the alien is entitled to remain in the United States for a period of time which is limited by something other than an official determination that the alien is not legally entitled to be in this country.

Although the Second Circuit in *Holley* used the broad language now quoted by the majority, the court in that case obviously viewed the case as unique and of little precedential import, and the court implicitly adopted an "official sanctioning" test. In that regard, the court said:

Far from being in a class with millions of aliens unlawfully residing in the United States, plaintiff is in what is almost certainly a minuscule sub-class of aliens who, although unlawfully residing in the United States, are each individually covered by a letter from the Department of Justice stating that the Immigration and Naturalization Service "does not contemplate enforcing ... [the alien's] ... departure from the United States at this time."

*Holley*, 553 F.2d at 849.

The respondents in this case and in the related case decided by this court today, *Division of Employment and Training v. Turynski*, 735 P.2d 469 (Colo.1987) (involving applicants for asylum), obviously are not part of any similar "minuscule sub-class." Indeed, both classes are probably quite large.[3]

Further, the facts of *Holley* are not inconsistent with the "official sanctioning" theory of *Esparza* and related cases. In *Holley*, the petitioner had received "official assurance" that she would not be deported at least until her six children—all American citizens—were no longer dependent on her. *Holley*, 553 F.2d at 849.

At various points in its opinion, the majority attempts to point out narrow factual differences that might limit its wholesale adoption of the broad language of *Holley* in future cases. However, I am unpersuaded that the majority views any of these potential limitations as critical. For example, at one point, the majority notes that "[t]he overwhelming majority of aliens who are legitimately married to United States citizens will be granted permanent residence status once their visa interview occurs." Maj.Op. at 480. In the majority's eyes, this apparently strengthens the respondents' claim to status as "permanently residing in the United States under color of law." However, in *Turynski*, the majority fails to note that most applicants for asylum will be *denied* that status—and yet the majority finds that these aliens, too, are "permanently residing in the United States under color of law." *See, e.g., Sudomir v. McMahon*, 767 F.2d at 1468.

Similarly, the majority hints at another point that it might adopt a more restrictive view if the benefits involved were welfare benefits rather than unemployment compensation. Maj.Op. at 481. However, the language adopted by the majority admits of no distinction between the types of benefits involved. Further, the case that the majority relies on as central to its analysis, *Holley*, was a case involving welfare benefits.

As a last attempt to justify its decision in this case, the majority analogizes to labor-relations statutes that permit stiff penalties to deter employers who engage in unfair labor practices. Maj.Op. at 481. In my experience, the notion that our unemployment compensation statutes are designed to penalize employers is a novel one,[4] and the majority is certainly stretching far afield to come up with reasons for its conclusion. Admittedly, in the past, we have construed the unemployment compensation statutes liberally in favor of disadvantaged workers of this state beset by the "crushing force" of unemployment. *See Industrial Commission v. Sirokman*, 134 Colo. 481, 485, 306 P.2d 669, 671 (1957); section 8–70–102, 3B C.R.S. (1986). However, if this case is explained solely as a humanitarian response on behalf of the majority to a vulnerable group, I would suggest the majority's decision is misguided. Although the court may be able to afford relief to these respondents by its decision today, the result may simply be to encourage the government in the future to deny

---

**3.** For example, the majority cites figures that show the INS granted legal permanent residency status to 119,644 aliens in 1983. Maj.Op. at 481.

**4.** In contrast, at footnote 13, the majority cites with approval cases characterizing unemployment compensation as a "simple insurance system."

aliens work authorization and other official concessions in order to avoid unintentionally incurring costly liabilities to aliens under the entitlement laws.

Accordingly, I respectfully dissent.

I am authorized to state that VOLLACK, J., joins in this dissent.

